FILED IN
14th COURT OF APPEALS
HOUSTON, TX
05/13/2015
CHRISTOPHER A. PRINE,
CLERK

**Cause No. 14-15-00058-CV**

IN THE FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS

_____

**HIGHMOUNT EXPLORATION & PRODUCTION, INC.,
AND DOMINION OKLAHOMA TEXAS EXPLORATION
& PRODUCTION, INC.**

*Appellants*,

v.

**HARRISON INTERESTS, LTD., DAN J. HARRISON, III,
AND BFH MINING, LTD.,**

*Appellee*.

_____

*On Appeal from Cause No. 2009-06060
In the 190th Judicial District Court of Harris County, Texas
The Honorable Patricia J. Kerrigan Presiding*

_____

# APPELLANTS' BRIEF

_____

|  | FARNSWORTH & vonBERG, LLP |
|---|---|
|  | T Brooke Farnsworth |
|  | brooke@fvllp.com |
| ORAL ARGUMENT | State Bar No. 06828000 |
| REQUESTED | Bennett S. Bartlett |
|  | bennett@fvllp.com |
|  | State Bar No. 01842440 |
|  | 333 North Sam Houston Parkway, Suite 300 |
|  | Houston, Texas 77060 |
|  | (281) 931-8902 – telephone |
|  | (281) 931-6032 – facsimile |
|  | ATTORNEYS FOR APPELLANTS |

# IDENTITY OF PARTIES AND THEIR COUNSEL

The following is a complete list of the names and addresses of all parties to the trial court's final judgment, or their successors in interest, and the names and addresses of all trial and appellate counsel:

*APPELLANTS:*

EnerVest Operating, LLC, (successor in interest to HighMount Exploration & Production LLC), and EnerVest Energy Institutional Fund XIII-A, L.P.,  EnerVest Energy Institutional Fund XIII-WIB, L.P., and EnerVest Energy Institutional Fund XIII-WIC, L.P. (successors to HighMount Exploration & Production Texas LLC).

*APPELLEES:*

Harrison Interests, Ltd., Dan J. Harrison, III, and BFH Mining, Ltd.

*COUNSEL:*

T Brooke Farnsworth
  State Bar No. 06828000
Bennett S. Bartlett
  State Bar No. 01842440
Farnsworth & vonBerg, LLP
333 North Sam Houston Parkway
Suite 300
Houston, Texas 77060
telephone: 281-931-8902
facsimile: 281-931-6032
www.farnsworthvonberg.com

*COUNSEL:*

Charles S. Kelley
  State Bar No. 11199580
Quinncy N. McNeal
  State Bar No. 24074690
Mayer Brown LLP
700 Louisiana Street
Suite 3400
Houston, Texas 77002
     telephone: 713-238-3000
facsimile: 713-238-4703
www.mayerbrown.com


TRIAL JUDGE:
Patricia J. Kerrigan
190th Judicial District Court

i

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND THEIR COUNSEL. . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT ON ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . vi

ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     KEY PROVISIONS OF THE ROYALTY AGREEMENT. . . . . . . . . . . . . . . . . . . . . 7

        A.      The royalty calculation methodology in the agreement. . . . . . . . . . . . 7

        B.      The post-production cost-sharing methodology in the
                agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.    THE TWO ISSUES CHALLENGED IN THIS APPEAL. . . . . . . . . . . . . . . . . . . . 13

        A.      Harrison's simplistic reading of the fuel gas provision is
                contradicted by other specific provisions of the agreement, and by
                an integrated reading of the agreement as a whole. . . . . . . . . . . . . 13

B.    Because the majority of the natural gas from the Subject Interests is compressed "downstream" from components of a "central facility," HighMount's compression charges are permissible "Marketing Costs" under the royalty agreement. . . . . . . . . . . . . . . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

iii

# INDEX OF AUTHORITIES

***Cases***:

*Alamo Nat'l Bank v. Hurd*, 485 S.W.2d 335
       (Tex. Civ. App.— San Antonio 1972, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . 1

*Atlantic Richfield Co. v. Holbein*,
       672 S.W.2d 507 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) .. . . . . . . . . . . 13

*Bendigo v. City of Houston*, 178 S.W.3d 112
       (Tex. App.— Houston [1st Dist.] 2005, no pet.). . . . . . . . . . . . . . . . . . . . . 6

*Birnbaum v. SWEPI, LP*,
       48 S.W.3d 254 (Tex. App.—San Antonio 2001, pet. denied). . . . . . . . . . . 13

*Cigna Ins. Co. v. Rubalcada*, 960 S.W.2d 408
       (Tex. App.— Houston [1st Dist.] 1998, no pet.). . . . . . . . . . . . . . . . . . . . . 6

*Comm'rs Ct. v. Agan*, 940 S.W.2d 77 (Tex. 1997). . . . . . . . . . . . . . . . . . . . . . . . . 6

*Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132 (Tex. 1994). . . . . . . . . . . . . . . . . 19

*Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118 (Tex. 1996). . . . . . . 9, 10

*MMP, Ltd. v. Jones*, 710 S.W.2d 59 (Tex. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Read v. Britain*, 414 S.W.2d 483(Tex. Civ. App.— Amarillo),
       *aff'd*, 422 S.W.2d 902 (Tex. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Royal Indem. Co. v. Marshall*, 388 S.W.2d 176 (Tex. 1965). . . . . . . . . . . . . . . . . 19

*Santanna Natural Gas Corp. v. Hamon Operating Co.*,
       954 S.W.2d 885 (Tex. App.— Austin 1997, pet. denied). . . . . . . . . . . . . . 18

*Other Authorities*:

Edward B. Poitevent, II, *Post-Production Deductions from Royalty*,
   44 S. Tex. L. Rev. 709 (Summer 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ernest E. Smith and Jacqueline Lang Weaver,
   *Texas Law of Oil and Gas* (2nd ed. 2014 LexisNexis). . . . . . . . . . . . . . . . 9

Patrick H. Martin and Bruce M. Kramer,
   *Williams & Meyers, Oil and Gas Law* (LexisNexis 2014). . . . . . . . . . . . . 10

Williams & Meyers, Manual of Oil & Gas Terms (14th ed. 2009). . . . . . . . . . . . 17

## STATEMENT OF THE CASE

Nature of the Case:    Appellee royalty interest owners brought suit alleging that the appellants breached an oil and gas royalty agreement by improperly deducting post-production costs from appellees' royalty payments.

Trial Court:    The 190th Judicial District Court of Harris County, Texas The Honorable Patricia J. Kerrigan presiding.

Trial Disposition:    Trial court granted summary judgment finding that appellants (1) improperly deducted marketing charges from appellees' royalty payments, and (2) failed to pay royalties to appellees on natural gas used as fuel in compressors necessary to transport natural gas to third party lines. The final judgment awards specific damages.

## STATEMENT ON ORAL ARGUMENT

How the parallel natural gas streams at issue in this appeal are gathered, transported, treated, and processed, particularly in light of industry custom and practice, bears heavily on the legal questions in this appeal. HighMount believes oral argument will assist the court in understanding the facts underpinning the parties' legal arguments.

# ISSUES PRESENTED FOR REVIEW

## Issue No. 1: Payment of royalty on gas consumed as fuel.

The royalty agreement between HighMount as producer and Harrison as royalty owner requires HighMount to pay royalties on the "gross proceeds" received for gas remaining after processing. Did the trial court err in ordering HighMount to pay royalty on gas used as fuel prior to processing when HighMount receives no payment for natural gas used as fuel prior to processing?

## Issue No. 2: Deduction of marketing costs.

The same agreement allows HighMount to charge Harrison 10 cents per MCF of gas to recoup capital costs for equipment installed "downstream" from a defined type of gas production facility. Did the trial court err in disallowing all of HighMount's charges when only a small portion of the gas does not pass through equipment installed downstream from such a facility?

## STATEMENT OF FACTS

### *Introduction*

This appeal asks the court to construe an oil and gas royalty agreement.[1] The agreement was written in 1990 in conjunction with Harrison Interests' sale of mineral interests to Meridian Oil Production Inc. R 9. As part of the consideration for the sale, the appellees (collectively, "Harrison") reserved a 5% non-participating royalty interest in conveyed properties and a 5% overriding royalty interest in conveyed leases.[2] R 9. The agreement defines the conveyed properties and leases together as the "Subject Interests." R 19.

HighMount acquired Meridian's interest in 2007 from Dominion, also an appellant. R 499. Based upon a review of audited royalty payment records, it appears that HighMount was using the same accounting practices (at least up to the time Harrison brought this suit) for royalty payments under the parties' agreement that both Dominion and the earlier royalty payors had been using. R 324, 499-500.

---

[1] A copy of the agreement is included as appendix B. Because the only copies of the agreement in the record are degraded photocopies, we have retyped the relevant provisions of the agreement and have included them in appendix B

[2] While there are distinctions between nonparticipating royalties and overriding royalties, those distinctions have no bearing on this dispute. *See generally Alamo Nat'l Bank v. Hurd*, 485 S.W.2d 335, 339 (Tex. Civ. App.— San Antonio 1972, writ ref'd n.r.e.) (discussing several Texas Supreme Court decisions holding that an overriding royalty is royalty).

Shortly after HighMount's acquisition of the Subject Interests in 2007, Harrison hired a valuation analyst named Alton R. Davis to audit HighMount's royalty payments. R 320. The audit process continued over the next two and a half years (that period included a litigation tolling agreement between the parties), and culminated in an audit report in the summer of 2010. *Id*. This appeal arises from a summary judgment against HighMount over two issues from the audit report that the parties could not resolve. Appx A.

*Gas Production from the Subject Interests*

The issues in dispute concern, first, HighMount's use of gas produced from the Subject Interests to power gas compressors and gathering equipment on the Subject Interests before the gas is sold to a third party, and second, a marketing charge of 10¢ per thousand cubic feet ("MCF") of gas that HighMount charges Harrison for preparing gas from the Subject Interests for market. A review of HighMount's post-production activities will help put these two issues in context.

HighMount or its affiliate gathers gas from numerous wells on the Subject Interests and then transports the gas through a field separator where liquids (oil and water) are removed from the gas and sent to tanks. R 502-03. Approximately 95% of the gas produced from the Subject Interests is then sent to a central facility referred to as the Canyon Ranch DP-6 Station ("DP6"). *Id*. A diagram of wells and gathering

2

lines on the Subject Interests is attached as appendix C. *See* R 583. DP6 has been highlighted for the court's convenience.

Two separate gas streams enter DP6, a "lean" gas stream and a "rich" gas stream. R 503. A diagram of the equipment and transmission lines at DP6 is included as appendix D. *See* R 584. The two separate intake lines have been highlighted in different colors, and the both lines begin at the top of the page.

The lean gas comes into DP6 in an 8-inch pipeline and immediately goes through two compressors. R 503. After compression it goes through separators, an amine unit,[3] and a heater, and is then delivered to a third party for transportation to market. *Id*.

The rich gas comes into DP6 through a 20-inch pipeline, immediately goes through a separator and meter, and then flows through two compressors prior to delivery to a third party, DCP Midstream, LLP, for transportation to DCP's Sonora Plant. R 503. At the Sonora Plant, it is further compressed and processed to extract natural gas liquids such as ethane, propane, butane, and natural gasoline. *Id*. The remaining gas that then emerges from the plant outlet or "tailgate" of the Sonora plant, primarily methane, is referred to as "residue gas." The residue gas is delivered

---

[3] Amine units are used to remove contaminants from a gas stream, most commonly hydrogen sulfide (H2S) and carbon dioxide (CO2).

at the tailgate to DCP Midstream for transportation to Katy, Texas where it is sold. *Id.*[4] Thus, the rich gas—unlike the lean gas—is compressed by HighMount after it undergoes other processing steps rather than before.

The crux of this appeal is whether or not HighMount is correctly paying royalties under the various inter-related terms of the royalty agreement. To answer that question, the Court will have to apply provisions of the royalty agreement to the processing steps just discussed. We will quote sections of the agreement below as they become relevant.

## ARGUMENT SUMMARY

The first issue in this appeal invokes the well-established rule that courts must read a contract as a whole to ascertain the drafters' intent. Based on a single sentence in the royalty agreement, Harrison argues that HighMount must find some way to pay royalties on the small portion of gas from the gas stream that is consumed as fuel in gathering and compressing the rest of the gas stream for market. The trouble with that claim is that it runs counter to everything else in the agreement. It contradicts the instruction that the royalty obligation will only reach fuel gas for which HighMount alone receives "proceeds." It is incongruent with the fact that both parties share the

---

[4] The remaining 5% of the gas goes through a facility named "DP2," but Harrison has never complained about or taken issue with paying any charges associated with DP2.

burden of the compression and gathering costs if a third party compresses and gathers the gas. And it ignores the fact that royalties are paid on residue gas, which is the gas remaining after processing, meaning that the gas used as fuel for processing is excluded from the royalty calculation. Accordingly, this Court must reverse the summary judgment in Harrison's favor and render a decision holding that the royalty agreement does not require HighMount's successor in interest to pay royalties on gas used as fuel before the gas stream is processed downstream.

The second issue, unlike the first, requires a remand because there is an open fact question. While it is unquestioned that gas enters DP6 in two streams, Harrison's expert witness discussed only the path taken through DP6 by the lean gas—the much smaller gas stream. He concluded that because the lean gas stream was compressed before undergoing the processes associated with a "central facility" (heating, separating, and metering), the compression did not occur "downstream" from a central facility and was therefore not eligible for the marketing deduction in the royalty agreement.

In contrast, the larger rich gas stream, which Harrison's expert did not discuss, is compressed after it undergoes the processes associated with a "central facility." Consequently, that stream does qualify for the 10¢ per MCF marketing fee charged by HighMount. Determining the correct charges cannot be accomplished by this

5

Court, however, because the parties never undertook the necessary discovery to delineate the damages for rich gas from those for lean gas. Therefore, the trial court's damage calculation must be reversed and remanded for further findings.

## ARGUMENT

### I. STANDARD OF REVIEW.

Because the trial court disposed of this case on summary judgment, its decision is to be reviewed de novo. *Bendigo v. City of Houston*, 178 S.W.3d 112, 113 (Tex. App.— Houston [1st Dist.] 2005, no pet.). When, as here, the parties filed competing summary judgment motions on the same issues, and the trial court granted one and denied the other, the court is to review the summary judgment evidence presented by both sides and if possible determine all questions presented. *Comm'rs Ct. v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997); *Cigna Ins. Co. v. Rubalcada*, 960 S.W.2d 408, 411-12 (Tex. App.— Houston [1st Dist.] 1998, no pet.). At the same time, because HighMount was the losing party, this court must take all evidence favorable to HighMount as true, indulge every reasonable inference in its favor, and resolve any reasonable doubt in its favor as well. *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986).

## II. KEY PROVISIONS OF THE ROYALTY AGREEMENT.

### A. The royalty calculation methodology in the agreement.

This appeal challenges two trial court rulings on the proper calculation of Harrison's royalties. Understanding the royalty payment method established by the royalty agreement is critical to understanding how the court erred in its rulings.

Paragraph 4 of the agreement contains the royalty payment provisions and is divided into five subparagraphs. Subparagraph (a) provides that royalty payments are to be measured not by the volume of gas produced but on the gross proceeds from gas sold:

> (a)  As to gas produced or to be produced from the Subject Interests under a Short Term Sale, the royalties shall be Owners' royalty share of the gross proceeds for the first sale or disposition of the gas from the Subject Interests, . . . . [Appx B ¶ 4 (emphasis supplied)].[5]

Subparagraph (c) provides that when produced gas contains liquid hydrocarbons that can be separated from the gas stream and sold profitably, royalties are owed on both the separated liquids and the residue gas, again, based upon on gross proceeds:

> (c)  If the gas produced from any well situated on the Subject Interests shall contain in suspension condensate, gasoline or other natural gas liquid hydrocarbons that economically can be separated from

---

[5]  Subparagraph (b) is not relevant to this appeal because it only applies to long term sales arrangements and there are no such arrangements.

7

the gas by the installation by Producer of traps, separators or other mechanical devices, then Producer shall install such devices on the surface of the Property, and Owners shall receive royalty on the condensate, gasoline or other natural gas liquids so recovered in accordance with the terms of paragraph 3 [regarding royalties on oil], together with royalty on the residue gas in accordance with the terms of paragraphs 4(a) and 4(b) of this Royalty Agreement. [Appx B ¶ 4 (emphasis supplied)].

When produced gas, including previously separated gas, is processed[6] for the purpose of removing not only liquid hydrocarbons but other elements of value such as sulfur, helium, and carbon dioxide, subparagraph 4(d) allows HighMount to deduct processing costs from the royalty on the separated elements, while royalty on residue gas is again measured on gross proceeds:

> (d)     If gas or casinghead gas or separated gas resulting from field separation produced from the Subject Interests is processed at any location by or for the account of Producer, or by or for the account of any affiliate of Producer, for the recovery and sale or other disposition for value of liquid hydrocarbons, helium, carbon dioxide, sulfur, or any other elements of the gas steam, then in lieu of royalties on gas provided in paragraphs 4(a) and 4(b), the royalties shall be Owners' royalty share of the gross proceeds less Owners' royalty share allocable portion of the reasonable, direct costs . . . of processing such gas in the plant for the recovery of such liquid hydrocarbons, helium, carbon dioxide, sulfur and other elements, and the royalties on the residue gas resulting from such processing operation attributable to gas produced from the Subject

---

[6] The royalty agreement defines "treating" to refer to the removal of contaminants from the gas stream, explicitly stating that the term shall not refer to "processing" gas to remove valuable liquid hydrocarbons for later sale. *See* Appx B ¶ 2 ("treating").

Interests shall be in an amount and determined as provided in paragraphs 4(a) and 4(b) above;[7] . . . . [Appx B ¶ 4 (emphasis supplied)].

Because all of the gas that enters DP6 is separated to remove valuable liquids, and the rich gas is also later processed at the Sonora plant (R 500), subparagraphs 4(c) and 4(d) are the provisions applicable to this case. And both calculate royalty as a proportion of the "gross proceeds" received for "residue gas."

## B.     The post-production cost-sharing methodology in the agreement.

Royalty calculation disputes like the one presented here are common in Texas jurisprudence.[8]  In the case of natural gas royalties in particular, disputes arise because gas producers and royalty owners share rights to the same undivided gas stream, yet only the producer controls how the gas is marketed and sold. And while the established rule burdens the producer alone with the cost of bringing the gas to the surface, royalty owners bear their proportionate share of the post-production costs

---

[7]  Notably, the final sentence of paragraph 4(d) protects the owner by insisting that its combined royalties for the residue gas plus the separated and sold liquid hydrocarbons shall never be less than the royalty that would have been paid if the liquids stayed in the gas stream and royalty was paid on the unprocessed gas. Thus, Harrison suffers no loss if HighMount's use of fuel to process the gas does not result in an increased royalty. Appx B ¶ 4.

[8]  *See generally* Edward B. Poitevent, II, *Post-Production Deductions from Royalty*, 44 S. Tex. L. Rev. 709, 713 (Summer 2004).

9

incurred between the mouth of the well and the eventual point of sale absent an agreement to the contrary.[9]

Post-production costs are incurred because natural gas is almost never ready for sale as it leaves the wellhead. By the time natural gas is sold, it has been treated to remove constituent elements, compressed, and transported to the point of sale. Each of these procedures has an associated cost. While parties are free to divide the cost of those operations as they wish, the traditional approach divides the cost proportionally between the parties based upon the parties' ownership percentages.[10]

The disputes in this appeal arise from a detailed agreement which bears all the earmarks of sophisticated industry players who recognized that their gas would need to undergo various post-production procedures before being transported to a downstream point of sale. Before we turn to the two specific issues in this appeal, it is important to look at the agreement as a whole to understand the overall cost-sharing scheme that they applied to post-production costs.

---

[9] *See* Ernest E. Smith and Jacqueline Lang Weaver, *Texas Law of Oil and Gas*, §4.6[C] (2nd ed. 2014 LexisNexis) (The royalty "must bear its proportionate share of costs incurred subsequent to production.") citing *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118 (Tex. 1996).

[10] *See generally* Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law*, § 645 (LexisNexis 2014) (costs incurred subsequent to production are to be borne on a pro rata basis between operating and nonoperating interests). Royalty is usually subject to post-production costs, including taxes, treatment costs to render it marketable, and transportation costs. *See also Heritage Resources v. Nationsbank*, 939 S.W.2d at 122.

Following customary practice, the parties decided that the royalty owner would bear its fair share of those costs. The agreement's "General Terms" allow the producer to deduct marketing costs from the owner's royalty up to a maximum of 10¢ per MCF:

> (b)  All royalties shall be determined and delivered or paid to Owners after deducting therefrom the following costs:
>
> (i)  as to gas produced from the Subject Interests, Owners' royalty share of Producer's monthly Marketing Costs for such gas; however, for purposes of this paragraph 7(b), Producer's monthly Marketing Costs (whether actually incurred by Producer or an affiliate of Producer or charged to the Producer by a third party) shall not exceed ten (10) cents per MCF . . . [Appx B ¶ 7.(b)(i)].

"Marketing Costs" includes post-production processes necessary to make the gas marketable, and the parties burdened the royalty owner with its proportional share of those costs up to a 10¢ per MCF maximum.

The agreement also allows the producer to deduct post-production costs associated with extracting liquid hydrocarbons from the owner's royalty. Paragraph 4(d) of the agreement, which we quoted above, addresses the royalty to be paid on both the extracted elements of the gas stream and the residue gas. The royalty on the extracted elements is subject to a deduction for "[o]wners' royalty share allocable portion of the reasonable, direct costs . . . of processing such gas in the plant for the

11

recovery of such liquid hydrocarbons, helium, carbon dioxide, sulfur and other elements, . . . ." [Appx B ¶ 4(d)]. Again, the parties proportionately share those costs.

Transportation costs are yet another expense that may be deducted from the royalty payments under the agreement. As we discuss in more detail in section III of this brief, the parties chose to measure the owner's royalty percentage not by the market value of the gas sold, but by the "gross proceeds" received for the gas. The definition of "gross proceeds" instructs that third-party transmission fees are deductible from royalty payments:

> In the event Producer transports, or causes to be transported, gas production from the Subject Interests on a gas transmission line to a market or sale "gross proceeds" for such gas shall be determined after deducting any fees or charges incurred by Producer from the owner of the gas transmission line for such delivery or transportation to such market or sale; [*Id*. ¶ 2 ("gross proceeds")].

Thus the agreement allows deduction of Marketing Costs, certain processing costs, and transportation costs from the owner's royalty payments. These post-production deductions share a common feature: they each benefit the parties jointly. Compression makes gas marketable for both parties' benefit. Extracted liquid hydrocarbons are sold for both parties' credit. Transportation takes gas in which both parties have an interest to a location for sale. The agreement, in other words, has a

basic approach to post-production procedures: where the benefits are shared, the costs are shared.

This cost-sharing arrangement can also be seen in the alternative marketing arrangement the agreement permits (but that Harrison never opted to take advantage of). The agreement allows the owner to take its gas in kind for short-term sales.[11] If Harrison did so, it would bear the costs of compressing and treating its own gas and transporting that gas to market. Thus when, as here, the producer takes those steps for the owner, it does so for both parties' benefit, and the parties share the agreed-upon post-production costs proportionately.

## III. THE TWO ISSUES CHALLENGED IN THIS APPEAL.

### A. Harrison's simplistic reading of the fuel gas provision is contradicted by other specific provisions of the agreement, and by an integrated reading of the agreement as a whole.

The first issue in this appeal is whether or not Harrison should be paid royalties on gas used as fuel to operate HighMount's compressors and gathering equipment in the field. Compression and gathering are necessary steps in preparing the gas for market, and HighMount's compressors and gathering equipment obviously require an

---

[11] The relevant language in paragraph 7(g) of the agreement begins:

In the event that Owners' royalty share of gas is not committed to a Long Term Sale in accordance with the provisions of this Agreement, then at any time and from time-to-time Owners make elect to take Owners' royalty share of gas production in kind and use or market same for their own account . . ..

energy source. Following industry custom, HighMount uses gas from the wells it operates to run its compressors and gathering equipment.[12]

There is no question that the gas consumed as fuel improves the value of the remaining gas by making it available for subsequent sale. And because the parties have proportionate interests, the reduction in the gas quantity reduces the parties' interests proportionately. Therefore, given the royalty agreement's cost-sharing approach to post-production procedures, it follows that the parties would jointly shoulder the loss of gas consumed for their mutual benefit.

Harrison nevertheless complains that it should be paid royalty on the gas used as fuel. Its argument rests upon a selective reading of the single sentence that constitutes paragraph 4(e) of the agreement:

> (e) Owners shall receive their royalty share of the gross proceeds for gas used or utilized on or off the Subject interests, such as gas used for fuel.

Harrison's deceptively simple conclusion from this sentence is that HighMount must find some way to pay Harrison for gas consumed in compression and gathering.

---

[12] It is common industry practice to use gas as fuel to run treatment equipment on the lease premises. *See, e.g., Atlantic Richfield Co. v. Holbein*, 672 S.W.2d 507, 516 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) ("uncontroverted testimony was that it is an industry-wide practice to deduct the allocated volume for fuel gas before computing the settlement owed to royalty owners); *Birnbaum v. SWEPI, LP*, 48 S.W.3d 254, 255 (Tex. App.—San Antonio 2001, pet. denied) (trial court's summary judgment finding that no royalties were due on gas used as plant fuel and compressor fuel affirmed).

When this sentence is put in the context of the rest of the agreement, however, it becomes clear that the drafters of the royalty agreement never intended for royalties to be paid on fuel gas used in compression and gathering and there are several reasons for this conclusion.

To begin with the most obvious, HighMount did not receive any "proceeds" from the gas used to run the compressor or the gathering lines. We acknowledge that the agreement defines the term "gross proceeds" quite broadly in an effort to reach the different kinds of commercial arrangements a producer might make to sell the produced gas:

> "gross proceeds" shall mean the entire economic benefit and all consideration in whatever form received by or accruing to Producer or an affiliate of Producer, including but not limited to sales proceeds or proceeds or benefits of an exchange, prepayments for future production, reimbursements for severance taxes or for other taxes or costs, settlements or payments for the release or amendment of a sales contract or arrangement, and take-or-pay payments or settlements and the like, and any insurance proceeds from lost or destroyed oil and gas, . . . . [Appx B ¶ 2].

But even under that broad definition, HighMount's use of gas in compressing and gathering does not qualify as the sort of "proceeds" that the parties intended to reach.

The sort of consideration that they did intend to reach can be discerned from the subsequent sentences of the definition. Each example of the type of economic benefit that the parties envisioned as "gross proceeds" is one in which the

15

producer—and the producer alone—would receive an economic benefit in a quid pro quo exchange with another party other than the royalty owner: transactions such as a prepayment for future production, a recovery under a take-or-pay arrangement, a payment for the release of a contract, a payment of insurance proceeds for lost or damaged gas, or the benefit of an exchange of some sort.

Unlike all of those examples, HighMount's use of gas for fuel does not arise from any sort of exchange, sale, or other payment. HighMount receives nothing in the way of proceeds or other direct consideration from any other party when it uses gas for fuel. Instead, the gas consumed as fuel to compress and gather the rest of the gas stream is a post-production "cost" to HighMount and Harrison alike rather than a "proceed" of any sale or exchange.

Furthermore, the economic benefit that does flow from the use of gas as fuel does not accrue exclusively "to Producer" as required by the definition of gross proceeds. Appx B ¶ 2. Both parties obtain the benefit of the gas reaching a market as a result of compression and gathering. If HighMount paid royalty on that gas, Harrison would get a windfall, a double dip of sorts, because both parties would be paid for gas sold at market, but only Harrison would also be paid for the gas consumed in making the remaining gas marketable. This uneven treatment is at odds with both the specific language of the agreement and the drafters' well-expressed

16

intent that the jointly-benefitting parties share in the post-production costs required to obtain those benefits.

A further problem with Harrison's reading becomes apparent when one is confronted with the difficulty of putting a value on gas used as fuel. There are no proceeds received for the gas from which one could calculate Harrison's royalty. Nor is there any sort of exchange or trade that one could look to as a relative value. The sale price many miles downstream is not directly helpful because the gas has a very different value at that location, having been augmented by compression, processing, and transportation.

Royalty could be calculated based on the downstream value by "backing out" the specific charges for treatment and transportation (as is typically done for so-called "market value" leases). But under the parties' agreement here there are no such charges to back out. Even Harrison's own expert never identified a value for the gas used to fuel the compressors, simply using the sales price at Katy, Texas. R 440, 757. That price is not comparable, however, because the gas that is sold in Katy has traveled several hundred miles and has been compressed more than once along the route. In short, there is simply no metric for measuring the "proceeds" value of gas burned up in the process of compressing, treating, and thereby enhancing the value of the rest of the gas that is then sold at a distant location.

Finally, and most significantly, the parties' decision to assess royalties on "residue gas" shows that they never intended for royalties to be paid on gas consumed in the treatment and processing steps. While "residue gas" is not defined in the royalty agreement, it has a well-defined meaning in the industry. Residue gas means "[g]as remaining after processing in a separator or other plant which removes liquid hydrocarbons contained in the gas when produced."[13] By definition, then, any volume of gas that enters a separator or plant is reduced by the time it comes out of the separator or the tailgate of the plant.

This reduction in volume is the key to understanding the parties' agreement on gas used as fuel. The parties' decision to base royalty payments on gross proceeds received for "residue gas" is a designation of the volume of gas on which royalties would be due: namely, the volume of gas leaving a separator or processing plant. Because the parties had a sophisticated understanding of oil and gas operations, they knew that the volume of gas would be reduced between the mouth of the well and the exit, or "tailgate," of a processing plant due to the loss of the liquid hydrocarbons

---

[13] Williams & Meyers, Manual of Oil & Gas Terms, 835 (14th ed. 2009). *Accord Amerada Hess Corp. v. Conrad*, 410 N.W.2d 124, 131 (N.D. 1987) (citing 8 Williams and Meyers, Oil and Gas Law, Manual of Terms, at p. 528 (1984)); *Read v. Britain*, 414 S.W.2d 483, 487 (Tex. Civ. App.— Amarillo), *aff'd*, 422 S.W.2d 902 (Tex. 1967).

removed and sold, the loss of gas used to run compressors and gathering equipment, and other shrinkage.[14]

The parties could have very well specified that royalties would be paid on gross volumes. They chose instead to use gross proceeds, and to tie the calculation of proceeds to the sale or other disposition of the volume of gas leaving a tailgate or separator outlet after processing. By choosing that measurement method, the parties agreed that no royalty is due on any natural gas consumed or used as fuel in any operation prior to that point. Consequently, the parties never intended for royalties to be paid on gas consumed in the preliminary steps required to make the gas marketable.

Harrison will contend that our reading makes the language requiring royalty payments on fuel gas meaningless. That is not at all the case. As one example, the provision would apply to a lessor's use of gas. It is not unusual for lessors to ask to use gas produced from their land as fuel for heating their homes, running equipment, etc. In exchange, the lessor might accept a lower royalty or grant an easement. The

---

[14] *See generally Santanna Natural Gas Corp. v. Hamon Operating Co.*, 954 S.W.2d 885, 889 n. 8 (Tex. App.— Austin 1997, pet. denied) ("Gas accounting is difficult because gas volumes and energy content fluctuate from day to day and a certain amount of volume shrinkage in the pipeline and plant is normal.").

value of the lesser royalty, or the value of the easement, would be the measure of the royalty owed by HighMount for fuel gas under paragraph 4(e).

The choice between the parties' competing explanations of the fuel gas provision is stark. Harrison's reading, which focuses solely on a single sentence in the agreement divorced from context, and which ignores the definition of the word "proceeds" in that sentence, runs contrary to the proper task of interpretation. Courts must give effect to the expressed intent of the parties' agreement as a whole, rather than interpret one provision in isolation.[15] "Courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract."[16]

By contrast, HighMount's reading of the fuel gas sentence squares with the agreement as a whole: it comports with the overall intent of the parties to proportionately share post-production costs; it gives meaning to the term "proceeds" in the fuel gas sentence; and it finds support in the parties' decision to base "gross proceeds" on "residue gas" remaining after separation, treatment, and other gas loss.

---

[15] *See Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 180 (Tex. 1965); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 135 (Tex. 1994).

[16] *Forbau*, 876 S.W.2d at 133.

Accordingly, the court must reverse the trial court's ruling in Harrison's favor and render a decision that the parties' royalty agreement does not require royalty payments on gas used as compressor and gathering fuel.

**B. Because the majority of the natural gas from the Subject Interests is compressed "downstream" from components of a "central facility," HighMount's compression charges are permissible "Marketing Costs" under the royalty agreement.**

The trial court's other ruling held that HighMount was not allowed to deduct gas compression charges from Harrison's royalty payments. HighMount deducts those charges pursuant to two interrelated provisions of the agreement. The first provision is found in the "General Terms" section and allows HighMount to deduct up to 10¢ per MCF for "Owners' royalty share of Producer's monthly Marketing Costs." Appx B ¶ 7. The second provision is the definition of "Marketing Costs," which reads in relevant part:

"Marketing Costs" shall mean:

(i)     the reasonable, capital costs of property actually installed by Producer or an affiliate of Producer after the Effective Time, which property:

*     *     *

(b)     is required to be installed downstream from a central facility in order to deliver gas produced from the Subject Interests to a gas transmission line or otherwise to a market; and

21

> (c)    is part of a facility to transport gas produced from the Subject Interests from a central facility to a gas transmission line or is part of a facility compressing or treating such gas as required for deliver to such a gas transmission line; and [Appx B (emphasis supplied)].

The Marketing Costs deductions HighMount takes are consistent with the parties' agreement. There is no question that compressing the gas mutually benefits the parties by making the gas marketable. It is equally clear that the compressors were, in the language of the agreement, "required to be installed . . . in order to deliver gas produced from the Subject Interests to a gas transmission line." Appx B. But based upon the physical location of some of the compressors vis-a-vis other gas treating equipment, Harrison found a sort of "gotcha" argument that appears to have swayed the trial court.

Harrison's argument rests upon the language in the Marketing Costs definition that requires a compressing facility to be "installed downstream from a central facility." R 686, 749. While the trial court did not explain its ruling, Harrison's primary argument[17] for rejecting compression charges was that the compressors were not physically located "downstream" from a "central facility," as the latter term was

---

[17]  Harrison's motion concluded with an accusation that HighMount failed to prove it built the compressor facilities in accordance with the Marketing Costs definition. R 555. If Harrison, as the movant, wanted to shift the burden of proof to HighMount, it needed to follow the procedure to file a no-evidence summary judgment motion, which it did not do.

22

defined in the agreement. Therefore, in Harrison's view, compression costs could not be deducted as Marketing Costs. To the extent the judgment below rests on this argument, it is error because the record reflects, at the very least, a genuine unresolved fact question, and at the most, a set of facts inconsistent with the trial court's ruling.

A "central facility," from which compressors must be downstream, is defined in the royalty agreement as follows:

> "central facility" shall mean the final set of heaters, separators, meters and tanks that are operated as a unit and into which production from more than one oil or gas well on the Subject Interests is gathered for final treating and measurement prior to delivery to a gas transmission line owned or operated by a principal purchaser of gas in the Permian Basin. [Appx B ¶ 2].

With this definition as the touchstone, the evidence submitted to the trial court to explain the location of the compressors at issue consisted solely of a diagram of DP6, and brief statements in two expert reports. But even this limited information demonstrated that the rich gas did qualify for the Marketing Costs deduction even under Harrison's argument.

The opinion from Harrison's expert, Don Rockwell, is the starting point because it makes HighMount's case. R 560. Rockwell looked at the diagram of DP6 and apparently missed the fact that there are two different gas inlets. Without

23

distinguishing which gas stream he was addressing, Rockwell explained that the gas is compressed at DP6 for delivery to a high pressure gas line. Based on that fact he opined that because the gas underwent additional treatment after leaving the compressors, the compressors were not downstream from a central facility:

> 4. Once the gas leaves the compressors, it then goes through other vessels on the facility, such as a filter separator, an eight-inch discharge meter, an amine contactor, a heat exchanger, a recovery separator, and a dehydration tower, before it flows to sale. Thus, downstream from these compressors are a series [sic] heaters, separators, meters, tanks and other vessels, where the gas is further treated and eventually sent to market. From my understanding of the Royalty Agreement, none of these compressors are downstream from a central facility, as that term is defined. [R 561].

The upshot of his analysis is telling. Rockwell concludes that because the gas flows through other treatment devices after being compressed, it can't be downstream of a central facility. By that reasoning, if the compressors are the last stop for the gas after going through other treatment devices but before it flows on to a third-party pipeline, the compressors are downstream from a central facility.

HighMount's expert, Allen Cummings, recognizing that there are two streams of gas flowing into DP6, reached just that conclusion. Observing that the definition of a "central facility" does not include any reference to compressors or compression, he pointed out that the compressors at DP6, by definition, cannot be part of a central facility. R 753-54. He concluded, therefore, that because the compressors of the rich

24

gas, unlike the lean gas, are located "downstream" from the other facility components that operate as a unit, the compression charges for rich gas satisfy the Marketing Costs definition in the royalty agreement. *Id*.

Cummings's conclusion is confirmed by the flow chart put into evidence by Harrison's expert, Don Rockwell. *See* R 772, 775. The print on the chart is so small that it is difficult to follow the path of the gas as it flows through the facility. To aid the Court's understanding of the schematic, HighMount highlighted the 20-inch line through which the rich gas flows, and the 8-inch line through which the lean gas flows, in different colors to make it easier to follow the path followed by the gas, and added colors for the other processing equipment on DP6 as well. *See* R 752, Appx D. As one can see from the diagram, the compressors for the rich gas are downstream from any other equipment, and are the last processing step for that gas prior to delivery to a gas transmission line.

Accordingly, by Harrison's own argument, the rich gas is eligible for the 10¢ per MCF charge for Marketing Costs. Because the trial court's judgment makes no distinction between the funds that HighMount owes to Harrison on lean gas versus rich gas, the trial court's summary judgment must be reversed and the case remanded for further factual findings on the quantity of gas qualifying for the Marketing Costs deduction.

## CONCLUSION

The drafters of the royalty agreement went to considerable effort to narrowly circumscribe the post-production costs that the parties would share. In deciding which costs would qualify, the drafter's litmus test was mutual benefit: where the treating or processing undertaken would improve the gas for the benefit of both parties, the cost was to be shared. Nevertheless, on the basis of a single sentence in the agreement, the trial court concluded that the parties did not intend to share fuel gas. The trial court's misreading of that sentence ignores the meaning of the term "gross proceeds," misses the import of paying royalties on "residue gas," and stands at odds with the ethos of the agreement as a whole.

As for the question of marketing costs, Harrison's own expert's position on the concept of "downstream" compression demonstrates that HighMount is allowed to deduct costs on the rich gas stream flowing through DP6.

## PRAYER

For the reasons presented, HighMount asks the Court to (1) reverse the trial court's summary judgment, (2) render a decision that HighMount has no obligation to pay royalties on gas it uses for compression and gathering fuel, (3) hold that HighMount is entitled to charge up to 10¢ per MCF for Marketing Costs for rich gas,

26

and (4) remand the case to the trial court for further findings on the amount of rich gas subject to that marketing charge.

Respectfully submitted,

FARNSWORTH & vonBERG, LLP

By: ___/S/   T Brooke Farnsworth___
    T Brooke Farnsworth
     State Bar No. 06828000
    Bennett S. Bartlett
     State Bar No. 01842440
    333 North Sam Houston Parkway
    Suite 300
    Houston, Texas 77060
    Telephone No. (281) 931-8902
    Facsimile No. (281) 931-6032

ATTORNEYS FOR APPELLANTS

## CERTIFICATE OF COMPLIANCE

The forgoing brief was generated by computer-based word-processing software, and I certify that the total number of words counted by that software, excluding those parts of the brief to be excluded under Rule 9.4(i), totals: 6,419.

/s/ Bennett S. Bartlett
Bennett S. Bartlett

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via e-service to the parties listed below on May 13, 2015.

Charles S. Kelley
ckelley@mayerbrown.com
Quinncy N. McNeal
qmcneal@mayerbrown.com
MAYER BROWN LLP
700 Louisiana Street, Suite 3400
Houston, Texas 77002
Facsimile: (713) 238-4703
ATTORNEY S FOR APPELLEES

/s/ Bennett S. Bartlett
Bennett S. Bartlett

# APPENDIX A

P5

8a

(Δ2,3,6)

12/2/2014 6 16 02 PM
Chris Daniel - District Clerk Harris County
Envelope No 3354569
By CAROL WILLIAMS
Filed 12/2/2014 6 16 02 PM

CAUSE NO. 2009-06060

| | | |
|---|---|---|
| HARRISON INTERESTS, LTD., DAN J. HARRISON III, AND BFH MINING LTD., | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| vs. | § § § | HARRIS COUNTY, TEXAS |
| HIGHMOUNT EXPLORATION & PRODUCTION, INC. AND DOMINION OKLAHOMA TEXAS EXPLORATION & PRODUCTION, INC., | § § § § § § | 190TH JUDICIAL DISTRICT |
| Defendants. | § § | |

## FINAL JUDGMENT

THE COURT, having considered the parties' pleadings, including the cross-motions for summary judgment, the summary judgment evidence attached thereto, the responses to the summary judgment motions, and the arguments of counsel for Plaintiffs Harrison Interests, Ltd., Dan J. Harrison, III and BFH Mining, Ltd. ("Plaintiffs") and Defendants HighMount Exploration & Production LLC ("HighMount") and Dominion Oklahoma Texas Exploration & Production, Inc. (collectively, the "Defendants"), is of the opinion and has ruled that Defendants have breached that certain Royalty Agreement, dated May 22, 1990, the subject of this litigation, by withholding payment of royalties for gas production used for fuel on those properties located in Annexes 1 and 2 of the Royalty Agreement in Sutton and Edwards Counties, Texas (the "Subject Interests") and by assessing improper marketing costs on the gas volumes produced on the Subject Interests, as described in Plaintiffs' motions for summary judgment and more fully below. IT IS FURTHER,

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

ORDERED that, pursuant to the Court's signed orders of June 4, 2014 granting summary judgment in favor of Plaintiffs as to Plaintiffs' Motion for Summary Judgment for Royalties on Gas Used for Fuel and as to Plaintiffs' Motion for Summary Judgment for Reimbursement of Marketing Costs, Defendants are required (i) to pay royalties to Plaintiffs on all production used as fuel on the properties to which the Royalty Agreement relates, and (ii) to remove any marketing deduction as none is entitled to be applied in light of the operations as they exist as of the date of this judgment; it is FURTHER

ORDERED that Plaintiffs shall recover from Defendants all principals sums owed based on improper royalty withholdings and inappropriate marketing deductions made on royalty payments that were made (or should have been made) on or before November 30, 2014 (including a missed royalty payment in its entirety for the production month of August 2014 which is not the subject of this suit and may have been missed accidentally), in addition to prejudgment interest (as provided for under the parties' contract) calculated at the Prime Rate (as announced by Texas Commerce Bank-Houston, N.A.) plus two percent (2%) from January 1, 2004 onward; it is FURTHER

ORDERED that, because Plaintiffs have incurred the attorneys fees and court costs in filing the action to enforce its right of payment, they shall additionally recover these reasonable and necessary attorneys fees and costs arising out of the prosecution of this matter, as provided under Texas Civil Remedies and Practice Code § 38.001(8) for actions in breach of contract, and the parties have announced their stipulation that, through the date of entry of this judgment only, the amount of such fees and costs that shall be payable by Defendants to Plaintiffs are $325,000, plus costs in an amount of $11,200.00; it is THEREFORE,

2

844

ORDERED, ADJUDGED and DECREED that Plaintiff Harrison shall recover from Defendants, either jointly or severally, the sum of $218,637.16 in principal damages for reimbursement of improper marketing cost deductions; the sum of $68,063.90 in principal damages for reimbursement of royalties on fuel gas use; and the sum of $100,697.03 in pre-judgment interest for payments that should have been made on or before November 30, 2014 under the royalty agreement between the parties, together with daily interest accruing on this combined amount at the rate of $55.72 per diem each day thereafter until entry of this judgment. Accordingly, Plaintiff Harrison shall recover the total of $387,398.09 from Defendants, either jointly or severally, in principal damages and interest, plus the additional accrued pre-judgment interest; it is FURTHER

ORDERED, ADJUDGED and DECREED that Plaintiffs Dan J. Harrison, III and BFH Mining, Ltd., each shall recover from Defendants, either jointly or severally, the sum of $6,641.27 in principal damages for reimbursement of improper marketing cost deductions; the sum of $2,202.07 in principal damages for reimbursement of royalties on fuel gas use; and the sum of $3,023.94 in pre-judgment interest for payments that should have been made on or before November 30, 2014 under the royalty agreement between the parties, together with daily interest accruing on this combined amount at the rate of $1.71 per diem each day thereafter until entry of this judgment. Accordingly, Plaintiffs Dan J. Harrison, III and BFH Mining, Ltd. shall each recover the total of $11,867.28 from Defendants, either jointly or severally, in principal damages and interest, plus the additional pre-judgment interest; it is FURTHER

ORDERED, ADJUDGED and DECREED that Plaintiff Harrison shall recover from Defendants, either jointly or severally, the amount of $325,000 in reasonable and necessary attorneys' fees and $11,200 for disbursements for those fees and expenses incurred up through

3

November 30, 2014, and that, in the event of any further legal work necessitated by post-judgment motions or practice, together with any legal work in successfully defending this judgment on appeal, Plaintiffs will be permitted to recover their reasonable attorneys' fees and expenses on further application in any additional amounts to be determined in the future by this Court and all defenses to such additional amounts may be urged at such time; it is FURTHER

ORDERED, ADJUDGED and DECREED that Defendants shall pay post-judgment compound interest on the outstanding amounts due under the judgment pursuant to Texas Finance Code § 304.002 from and after the date of entry of this judgment until such amounts are paid in full, and such post-judgment interest shall accrue on all amounts required to be paid hereunder and be payable at a rate of the Prime Rate (as announced by Texas Commerce Bank-Houston, N.A.) plus two percent (2%) compounded annually from the date of entry of the judgment until the amounts required hereunder are satisfied; and it is FURTHER

ORDERED, ADJUDGED and DECREED that Defendants shall bear all costs of court.

All writs and processes for the enforcement and collection of this judgment may issue as necessary. The parties agree and acknowledge that Harrison has not been paid the sum of $31,988.41 in principal for the missing royalty check for August 2014 production, which HighMount will remit along with the December payment.

All other relief sought and not expressly granted herein is DENIED.

SIGNED this 16 day of December 2014.

JUDGE PATRICIA J. KERRIGAN

4

*AGREED AS TO FORM*
        *AND STIPULATED AS TO FEES AND EXPENSES (through Nov. 30, 2014):*

By:/s/ *Charles S. Kelley*
Charles S. Kelley
MAYER BROWN LLP
700 Louisiana St., Suite 3400
Houston, Texas, 77002
Tel. 713-238-3000
Fax. 713-238-4634

**ATTORNEY FOR PLAINTIFFS HARRISON INTERESTS, LTD., DAN J. HARRISON, III AND BFH MINING, LTD.**

By: /s/ *T. Brooke Farnsworth*
T. Brooke Farnsworth
Farnworth & vonBerg
333 North Sam Houston Pkwy
Suite 300
Houston, Texas 77060
Tel. 281-931-8902
Fax. 281-931-6032

**ATTORNEY FOR DEFENDANTS HIGHMOUNT EXPLORATION & PRODUCTION LLC AND DOMINION OKLAHOMA TEXAS EXPLORATION & PRODUCTION, INC.**

5

847

# APPENDIX B

## ROYALTY AGREEMENT

This Royalty Agreement is made and entered into to be effective as of the Effective Time stated below, by and between HARRISON INTERESTS, LTD., a Texas limited partnership, DAN J. HARRISON III and BRUCE F. HARRISON (together, "Owners"), on the one hand, and MERIDIAN OIL PRODUCTION INC. ("Producer"), a Delaware corporation, on the other hand, with respect to the surface estate and mineral estate in the lands located in Edwards and Sutton Counties, Texas, described in Annex 1 hereto (the "Property") and the oil, gas and mineral leases and oil and gas leases described in Annex 2 hereto covering lands located in Edwards and Sutton Counties, Texas (the "Leases").

### RECITALS

A. By deeds of even date herewith and described in Annex 3 hereto (the "Deeds"), Owners have sold and conveyed to Producer all of Owners' interest in the Property excepting and reserving to Owners a 5% of 8/8 perpetual nonparticipating royalty interest.

B. By assignments of even date herewith and described in Annex 3 hereto (the "Assignments"), Owners also have sold and conveyed to Producer all of Owners' interest in the Leases excepting and reserving to Owners a 5% of 8/8 overriding royalty interest in each of the Leases.

C. Owners and Producer wish to set out in this Royalty Agreement the terms and provisions that will govern administration and payment of such royalty interests, which terms and provisions are in addition to any general terms and provisions stated in the conveyances made to Producer.

### AGREEMENT

NOW, THEREFORE, for sufficient value received by each, and in consideration of the covenants contained herein, Owners and Producer agree:

1. **Agreement.** This Royalty Agreement shall apply to those perpetual nonparticipating royalty interests (the "Nonparticipating Royalties") in the Property created by exception and reservation to Owners in the Deeds and to those overriding royalty interests (the "Overrides") in the Leases created by exception and reservation to Owners in the Assignments. The terms and provisions of this Royalty Agreement shall control and govern over any contrary or inconsistent terms or provisions of such conveyances.

2. **Definitions.** For purposes of this Royalty Agreement, the following terms shall have the following meanings:

"affiliate of Producer" shall mean any individual, corporation, joint venture, partnership or other entity or organization controlling, controlled by or under common control with Producer (the concept of control meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of another) whether through ownership of voting securities, by contract or otherwise.

"central facility" shall mean the final set of heaters, separators, meters and tanks that are operated as a unit and into which production from more than one oil or gas well on the Subject Interests is gathered for final treating and measurement prior to delivery to a gas



transmission line owned or operated by a principal purchaser of gas in the Permian Basin.

"Governmental Regulations" shall mean all laws, ordinances, statutes, codes, rules, regulations, orders and decrees of the United States of America, the State of Texas, the Texas Railroad Commission, Edwards County, Sutton County, or any other political subdivision in which the Subject Interests are located, and any other political subdivision, agency or instrumentality exercising jurisdiction over Owners, Producer or the Subject Interests.

"gross proceeds" shall mean the entire economic benefit and all consideration in whatever form received by or accruing to Producer or an affiliate of Producer, including but not limited to sales proceeds or proceeds or benefits of an exchange, prepayments for future production, reimbursements for severance taxes or for other taxes or costs, settlements or payments for the release or amendment of a sales contract or arrangement, and take-or-pay payments or settlements and the like, and any insurance proceeds from lost or destroyed oil and gas, provided that "gross proceeds" shall not include any fee or charge for services (transportation, compression, treating and the like) relating to gas produced from the Subject Interests after such gas leaves the Subject Interests. In the event Producer transports, or causes to be transported, gas production from the Subject Interests on a gas transmission line to a market or sale "gross proceeds" for such gas shall be determined after deducting any fees or charges incurred by Producer from the owner of the gas transmission line for such delivery or transportation to such market or sale; such fees or charges shall be for transportation of gas after it leaves facilities to which Marketing Costs, if any, relate and shall exclude fees or charges of Marketing Costs.

"Long Term Sale" shall mean any contract, agreement, arrangement or exchange concerning disposition of production from the Subject Interests for a term greater than twelve (12) months.

"Marketing Costs" shall mean:

(i) the reasonable, capital costs of property actually installed by Producer or an affiliate of Producer after the Effective Time, which property:

(a) is depreciable for purposes of the Internal Revenue Code of 1986, as amended; and

(b) is required to be installed downstream from a central facility in order to deliver gas produced from the Subject Interests to a gas transmission line or otherwise to a market; and

(c) is part of a facility to transport gas produced from the Subject Interests from a central facility to a gas transmission line or is part of a facility compressing or treating such gas as required for delivery to such a gas transmission line; and

(ii) charges made by a third party that is not an affiliate of Producer directly attributable to property actually installed after the Effective Time, which property:

2



(a) is installed downstream from a central facility in order to transport gas produced from the Subject Interests to a gas transmission line or otherwise to a market; and

(b) is part of a facility required to transport gas produced from the Subject Interests from a central facility to a gas transmission line, or is part of a facility compressing or treating such gas as required for delivery to such a gas transmission line.

As to property actually installed by Producer or an affiliate of Producer, Marketing Costs shall be calculated as a monthly charge on a per MCF basis for the facilities to which the Marketing Costs relate, with such Marketing Costs amortized on a straight-line basis for the expected life of such facilities and based on the entire design capacity throughput of the facilities. Marketing Costs charged to Producer by a third party shall be the rate actually charged to Producer.

"MCF" means one thousand (1,000) cubic feet of gas, with "cubic feet of gas" meaning the amount of gas contained in a cubic foot of space and at a base pressure of fourteen and sixty-five one-hundredths (14.65) pounds per square inch absolute and at a base temperature of sixty degrees Fahrenheit.

"mineral substances" shall mean all mineral substances or rights other than oil and gas, even if such substances occur so near the surface of the ground that they can or must be mined, produced or exploited by stripping away or otherwise destroying or substantially disturbing the surface of the ground, but excluding brick and cement clay, ground water, subsurface water or water rights, top soil, loam and ordinary clay. By way of illustration, but not in limitation, such mineral substances or rights that are "mineral rights" for purposes of this Royalty Agreement shall include sulphur, salt, coal, lignite, tar sands, heavy oil, tar, kerogen, uranium, vanadium, thorium and other fissionable substances, all precious and base metals, geothermal energy (including heated water and steam, entrained methane, hydrostatic pressure and thermal energy), bauxite, iron ore, sand, gravel, rock, shell, caliche, limestone and any other mineral substance or right including near surface substances used as road building and road construction materials.

"oil and gas" shall mean any or all of the following: oil, liquid hydrocarbons, gas, and their respective constituent products, and any other substances produced in conjunction with oil and gas, or either of them; "oil" shall mean oil, other liquid hydrocarbons and their respective constituent products, and any other substance produced in conjunction with oil; "gas" shall mean gas and its constituent products and any other substance produced in conjunction with gas.

"oil or gas well" shall mean a vertical borehole with a wellhead, regardless of the number of horizontal drainholes that may be drilled or that exist connected to such vertical borehole, drilled and maintained for the purpose of producing oil and gas.

"quality" of oil and gas, mineral substances or subsurface rights shall mean physical characteristics of oil and gas, such as grade, gravity, BTU content and the like, or physical characteristics of the mineral substances

3



or subsurface rights, and Governmental Regulations applicable to the oil and gas, mineral substances or subsurface rights, but not contractual terms.

"Short Term Sale" shall mean any contract, agreement, arrangement or exchange concerning disposition of gas from the Property for a term of twelve (12) months or less, provided that each renewal, extension or rollover of such an agreement for a new term of twelve (12) months or less shall be considered as a new "Short Term Sale".

"spot gas" shall mean gas sold under a Short Term Sale.

"Spot Gas Price" as to gas for a calendar month shall mean the arithmetical average of the two highest index or average prices (or the two highest prices, if there are no index or average prices) for the month stated in available publications that collectively state monthly prices for spot gas offered by at least five (5) principal purchasers of gas in the Permian Basin for gas to be resold or redelivered outside the Permian Basin. Sellers and Purchaser agree that as of the Effective Time the publications used for this purpose shall be "Inside F.E.R.C.'s Gas Market Report" and the monthly survey distributed by Natural Gas Clearinghouse, Houston, Texas, but other such publications shall be utilized or substituted at such time as "Inside F.E.R.C.'s Gas Market Report" and such survey by Natural Gas Clearinghouse cease to state monthly prices for spot gas offered by at least five (5) principal purchasers of gas in the Permian Basin for gas to be resold or redelivered outside the Permian Basin, provided that if there are no such publications or surveys of spot gas prices for gas produced from and delivered from the Permian Basin that are serviceable for the purpose contemplated herein, then "Spot Gas Price" shall be the arithmetical average of the two highest prices then being paid in the Permian Basin on such date or dates, for spot gas in arms- length sales between nonaffiliated parties, such prices to be appropriately adjusted for any differences in quality.

"Subject Interests" shall mean the Property and the Leases.

"subsurface rights" shall mean the right to store, allow or permit storage of, in subsurface areas or formations of the Property, oil and gas or mineral substances that are not native to the Property, or wastes, products or any other substance, and rights to use or exploitation of caves or caverns in or under the Property, whether any or all of such rights are part of the surface estate or part of the mineral estate.

"taxes" shall mean severance taxes, ad valorem taxes and like taxes imposed by Governmental Regulations.

"treating" shall mean processing of gas for the removal of contaminants such as water or hydrogen sulfide, and not processing for the recovery for sale of constituents of the gas such as carbon dioxide, helium, hydrocarbon liquids and sulfur.

3. Oil. Royalties on oil shall be Owners' royalty share of the oil produced or sold from the Subject Interests, the same to be delivered at the wells to the credit of Owners into the pipeline or other facilities to which the wells may be connected, provided that Producer may from time to time purchase any royalty oil in Producer's possession and allocable to Owners' royalty share, paying therefor the gross proceeds for

4

sale or disposition of the oil from the Subject Interests or use of utilization of such oil on or off the Subject Interests, but such purchases by Producer shall be subject to termination at the discretion of Owners by providing written notice to Producer on or before the fifteenth day of the month prior to the month in which Owners desire to terminate purchases by Producer.

4. Gas.

(a) As to gas produced or to be produced from the Subject Interests under a Short Term Sale, the royalties shall be Owners' royalty share of the gross proceeds for the first sale or disposition of the gas from the Subject Interests, provided that such royalties never shall be less than Owners' royalty share of the aggregate sum derived by multiplying the Spot Gas Price of such gas for the month or months covered by the Short Term Sale by the respective volumes of gas sold in such month or months under the Short Term Sale.

(b) In the event Producer intends to make gas produced or to be produced from the Subject Interests subject to a Long Term Sale, Producer shall notify Owners in writing of such intent prior to entering into such Long Term Sale and provide Owners with complete information regarding the buyer, price and other terms and conditions of the proposed Long Term Sale. Producer shall give Owners further written notice at such time as Producer proposes to execute the instrument documenting the Long Term Sale, which notice shall include a complete, legible copy of such instrument. Owners shall have fifteen (15) business days after receipt of Producer's notice containing a copy of the instrument proposed for documenting the Long Term Sale in which to elect either to ratify same and commit Owners' royalty share of gas to the Long Term Sale or to reject same and take Owners' royalty share of gas in kind, provided that as to all gas sold under a Long Term Sale to an affiliate of Producer, in addition to all other rights granted herein, Owners shall have the right to receive their royalty share of such gas based on the greater of (i) the gross proceeds for disposition of the gas from the Subject Interests or (ii) the Spot Gas Price of the gas so sold multiplied by the respective volumes of gas sold each month under the Long Term Sale, provided that if at any time or from time to time there does not exist a Spot Gas Price for gas disposed from the Subject Interests, then the royalties shall be the market value of such gas as established by reference to arms-length sales of gas in the Permian Basin between nonaffiliated parties, appropriately adjusted for any differences in quality. If Owners elect to ratify the Long Term Sale, Producer shall use all reasonable efforts to have Owners named a party "Seller" entitled to receive payment directly from the purchaser and without having Producer act as "Seller's Representative" or in like capacity as to sales proceeds or other matters. If Owners elect to take their gas in kind, the Balancing Provisions provided below shall be in effect.

(c) If the gas produced from any well situated on the Subject Interests shall contain in suspension condensate, gasoline or other natural gas liquid hydrocarbons that economically can be separated from the gas by the installation by Producer of traps, separators or other mechanical devices, then Producer shall install such devices on the surface of the Property, and Owners shall receive royalty on the condensate, gasoline or other natural gas liquids so recovered in accordance with the terms of paragraph 3 of this Royalty Agreement, together with royalty on the residue gas in accordance with the

5

terms of paragraphs 4(a) and 4(b) of this Royalty Agreement.

(d) If gas or casinghead gas or separated gas resulting from field separation produced from the Subject Interests is processed at any location by or for the account of Producer, or by or for the account of any affiliate of Producer, for the recovery and sale or other disposition for value of liquid hydrocarbons, helium, carbon dioxide, sulfur, or any other elements of the gas stream, then in lieu of royalties on gas provided in paragraphs 4(a) and 4(b), the royalties shall be Owners' royalty share of the gross proceeds less Owners' royalty share allocable portion of the reasonable, direct costs (excluding amortization and depreciation on pipeline and plant investment and direct overhead associated therewith) of processing such gas in the plant for the recovery of such liquid hydrocarbons, helium, carbon dioxide, sulfur and other elements, and the royalties on the residue gas resulting from such processing operation attributable to gas produced from the Subject Interests shall be in an amount and determined as provided in paragraphs 4(a) and 4(b) above; provided, however, that in the event liquid hydrocarbons, helium, carbon dioxide, sulfur or any other elements of the gas stream are recovered and sold separate from the basic gas stream as contemplated in this paragraph, the total royalties paid to Owners on such production (after deduction of the above costs) never shall be less than would have been paid to Owners if the liquid hydrocarbons, helium, carbon dioxide, sulfur, or any other elements of the gas stream had remained in, and been sold as, part of the basic gas stream.

(e) Owners shall receive their royalty share of the gross proceeds for gas used or utilized on or off the Subject Interests, such as gas used for fuel.

5. _Subsurface Rights_. On subsurface rights in the Property, the royalties shall be Owners' royalty share of the market value for use or utilization of such rights as established from time to time by the greater of (i) arms-length sales or leases of such rights in the Permian Basin between nonaffiliated parties appropriately adjusted for any differences in quality, or (ii) gross proceeds.

6. _Mineral Substances_. On mineral substances in the Property, the royalties shall be Owners' royalty share of the market value of mineral substances sold from the Property or used or utilized off the Property for any purpose, such value to be established from time to time by the greater of (i) arms-length sales or leases of such substances in the Permian Basin between nonaffiliated parties appropriately adjusted for any differences in quality, or (ii) gross proceeds.

7. _General Terms_. The following general terms shall apply to the royalties covered by this Royalty Agreement:

(a) Producer will use its best efforts to obtain a market for and sell oil and gas and mineral substances produced from the Subject Interests at the maximum rate possible given prudent operating standards. Producer also will use its best efforts to qualify all oil and gas and other mineral substances or rights produced or sold from the Subject Interests for the maximum legal sales price under Governmental Regulations, if applicable.

(b) All royalties shall be determined and delivered or paid to Owners after deducting therefrom the following costs:

6



(i) as to gas produced from the Subject Interests, Owners' royalty share of Producer's monthly Marketing Costs for such gas; however, for purposes of this paragraph 7(b), Producer's monthly Marketing Costs (whether actually incurred by Producer or an affiliate of Producer or charged to the Producer by a third party) shall not exceed ten (10) cents per MCF and shall be charged only as to gas production put through the facility for which the Marketing Costs are charged; and

(ii) taxes applicable to Owners' royalty share of production.

Owners' royalties shall bear no other costs or expenses of any kind.

(c) (i) Accounting and payment by Producer to Owners of royalties from the production of oil shall be made on or before sixty (60) days after the end of the calendar month in which the production occurred.

(ii) Accounting and payment to Owners of royalties from gas sold under a Long Term Sale that is ratified by Owners and in which Producer acts as "Sellers' Representative" for purposes of receipt of gas sales proceeds due to the requirements of the buyer, shall be made on or before thirty (30) days after Producer's receipt of gross proceeds from the sale of the gas.

(iii) Accounting and payment by Producer to Owners of royalties from the sale of gas under a Short Term Sale or under a Long Term Sale to an affiliate of Producer shall be made on or before sixty (60) days after the end of the calendar month in which production occurs, provided that any deficiency in Producer's periodic royalty payments based on comparing Producer's gross proceeds with applicable Spot Gas Prices under the provisions of paragraphs 4(a) or 4(b) shall be paid to Owners on a calendar quarter basis, within thirty (30) days after Producer's receipt of Owners' invoice therefor, unless Producer in good faith disputes such invoice by written notice to Owners delivered within such thirty (30) day period. Owners' failure to supply such an invoice shall not operate as a waiver or release of deficient royalty payments.

(iv) Any royalties or other payments to Owners provided for herein shall be paid to Owners at the address specified herein and shall accrue interest at the prime rate as announced from time to time by Texas Commerce Bank-Houston, N.A. plus two percent (2%) from due date until paid (as to disputed amounts, interest shall be due as to the amount paid in settlement of the dispute, if any, with the due date commencing sixty (60) days after the end of the calendar month in which the production to which the dispute relates occurs), provided that such interest rate shall be spread, pro-rated, reduced or eliminated automatically to the legal maximum rate in the event same ever exceeds such maximum rate of interest to the end that this provision never shall constitute Owners to be in violation of any Federal of State usury laws. Unless preempted by Federal law, the maximum rate of interest shall be determined under the laws of the State of Texas. Acceptance by Owners, its

7



successors, agents or assigns, of royalties that are past due shall not act as a waiver or estoppel of its right to receive or recover interest due thereon under the provisions hereof. No tender or payment to Owners of a sum less than the total amount due to Owners shall be deemed a full settlement, whether by accord or satisfaction or otherwise, notwithstanding a check in tender of payment may contain language of settlement or accord printed or otherwise inserted thereon unless made and received in accordance with a separate written agreement executed by Owners and Producer.

(d) Producer shall maintain complete and accurate books and records regarding the production, sale, use, utilization or lease of oil and gas or mineral substances from the Subject Interests and subsurface rights in the Property, and as to Producer's Marketing Costs. Upon reasonable notice to Producer, Owners shall have the right to examine and copy, at Owners' expense, all books, records, documents, statements, purchase agreements, sale agreements, operating agreements and any other instruments or records of Producer or an affiliate of Producer relating to production volumes, gross proceeds of oil and gas or mineral substances from or in the Subject Interests, and as to Producer's Marketing Costs. Such examination shall be conducted at the offices of Producer during normal business hours. Owners, or its agents or representatives, shall have the further right, at Owners' sole risk and expense, to go upon the Subject Interests, once each calendar year, to inspect the Subject Interests for reconciliation of Owners' review of Producer's books and records, and verification of the existence and extent of facilities related to Producer's Marketing Costs provided that Owners shall not have access to the rig floor and Owners shall not interfere with Producer's operations. Prior to Owners going upon the Subject Interests, Owners shall give Producer notice of their desire to go upon the Subject Interests and Producer shall arrange a mutually agreeable time for inspection that is within thirty (30) days after Producer's receipt of said notice. Owners' notice shall include a description of those items it wishes to inspect. Each inspection by Owners shall be limited in duration to no longer than one (1) work day. Within a reasonable time not to exceed ninety (90) days after receiving a written request from Owners, Producer also shall supply to Owners complete and accurate copies of all agreements respecting the sale or use of oil and gas, mineral substances and subsurface rights.

(e) The terms and provisions of this Royalty Agreement shall be binding on Owners and Producer and their respective heirs, successors and assigns and shall be covenants running with the Property and shall supersede the terms of any lease or other conveyance of the Property or any interest therein as to the administration and payment of Owners' royalty.

(f) Producer at all times and from time to time shall use its best efforts to obtain for the oil and gas, mineral substances or storage rights in and under the Subject Interests, (i) the highest possible price, fee or allowable available under Governmental Regulations and (ii) any tax credit, tax abatement, tax rebate or similar benefit available under Governmental Regulations, including without limitation the tight-sands tax credit currently available under Federal law and any severance tax abatement or reduction available under Texas law.

8



(g) In the event that Owners' royalty share of gas is not committed to a Long Term Sale in accordance with the provisions of this Agreement, then at any time and from time-to-time Owners may elect to take Owners' royalty share of gas production in kind and use or market same for their own account or to elect to deem royalty percentage of gas as not being produced, to the end that Owners' share of production is stored and covered under the Balancing Provisions provided below. Owners shall make such election by providing written notice to Producer prior to the fifteenth day of the month preceding the month in which Owners intend to take gas in kind or to store gas; likewise, Owners may terminate their election to take gas in kind or to store gas by providing written notice to Producer prior to the fifteenth day of the month preceding the month in which Owners cease to take gas in kind or store gas. In the event Owners elect to take its royalty in kind, it shall have the further right to use any of Producer's production, gathering and treating facilities and thereby incur only the expense of any separate metering device necessary for Owners' separate marketing operations. The Balancing Provisions provided below shall be in effect in the event Owners ever elect to store gas under the provisions of this paragraph, or in the event Owners ever produce a greater share of production than their royalty percentage due to their taking production in kind. Any possible sales by a party of the other party's share of production shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year, and at all times shall be subject to revocation at will by the other party. In the event Owners elect to take production in kind, Producer shall transport, or use reasonable efforts to cause to be transported, Owners' royalty share of production to a mutually agreeable point on Producer's or affiliate of Producer's, gathering system, for redelivery to Owners or Owners' agent, provided that Producer shall not be required to enter into new agreements with third parties or to construct new facilities to transport or cause transportation of Owners' production. In the event Producer or an affiliate of Producer so transports or causes to be transported gas for Owners, Owners shall pay the Marketing Costs for such transportation, if any, for use of facilities installed by Producer or an affiliate of Producer after the Effective Time, but not to exceed a charge of ten (10) cents per MCF for the gas so transported. In the event Producer causes a third party to so transport gas for Owners under an agreement then existing between Producer and third party, Owners shall pay the fee charged to Producer by the third party, as to the volume of Owners' gas so transported. If Owners cause a third party to transport Owners' gas, Owners shall be responsible for the fee charged by such third party.

8. **Balancing Provisions.**

(a) Notwithstanding anything to the contrary in this Royalty Agreement, if in accordance with the provisions hereof, either party hereto takes and disposes of less than its percentage share of production during any calendar month, then the volume not taken by such party may be taken by the other party.

(b) These Balancing Provisions shall apply separately to each category established by Governmental Regulation for the purpose of regulating or deregulating the price of production, including but not limited to categories established by the Natural Gas Policy Act of 1978 and

9

regulations or orders of the Federal Energy Regulatory Commission or any successor or similar agency or Commission. In the event a category is revised, the category as revised shall be considered a new and separate category.

(c) The term "Cumulative Underproduction" means the amount by which the cumulative volume of production taken by a party within a particular category is less than the cumulative volume such party was entitled to take within such category according to its percentage interest; the term "Cumulative Overproduction" means the amount by which the cumulative volume of production taken by a party within a category exceeds the cumulative volume that such party was entitled to take within such category according to its percentage interest; the term "Underproducer" means a party credited with Cumulative Underproduction; the term "Overproducer" means a party charged with Cumulative Overproduction; and the term "Make-Up Production" means the volume taken by a party to make up Cumulative Underproduction pursuant to Paragraph (e) below.

(d) On or before ninety (90) days after the end of each calendar month of production, Producer shall furnish to Owners a written statement showing for each category (i) the total volume of production taken by each party during such month and (ii) the Cumulative Overproduction or Cumulative Underproduction, if any, of each party as of the end of that month.

(e) By giving written notice to Producer at least 15 days before the beginning of a calendar month, a party shall be entitled to take during that month, in addition to its full percentage interest share of production, a volume of Make-Up Production equal to its Cumulative Underproduction, provided that to accommodate such make-up the other party shall never be required to take less than 75% of its percentage interest share of production during the month, and provided that the right to take Make-Up Production shall be subordinate to the right of Producer to take its full percentage interest share of production from time to time to satisfy the deliverability test requirements of any sales contract applicable to production from the Property. Make-Up Production volumes shall be applied against Cumulative Underproduction and Cumulative Overproduction on a first-in-first-out basis.

(f) If the parties have not achieved a volumetric balance in production in all categories upon a permanent cessation of all production from the Property, Producer shall furnish to Owners a statement showing the final Cumulative Overproduction and Cumulative Underproduction of each party by category, and the month and year in which it accrued. Within 120 days after receipt of Producer's statement, each Overproducer shall furnish to the Underproducer a statement showing the value of its Cumulative Overproduction for each category, based on the price the Overproducer actually received for the production in a sale during the month(s) in which the Cumulative Overproduction accrued, less all payments made by the Overproducer pursuant to Paragraph (h) below. For production sold by Producer, value for this purpose shall be based on the provisions of the foregoing royalty reservation; for Owners, value for this purpose shall be based on the price actually received by Owners. Based upon the statements furnished by Overproducers, the net amount owed by or to each party for all categories combined shall be calculated by Owners and furnished to Producer in a final cash balancing statement.

10

(g) Within 120 days after receipt of Producer's final cash balancing statement, the Overproducer shall pay the Underproducer in accordance with the statement and without interest. To the extent any value used to calculate a cash settlement hereunder is subject to refund by the Overproducer pursuant to Governmental Regulation, the Underproducer shall, prior to payment thereof, agree in writing to indemnify the Overproducer against the Underproducer's proportionate part of any refund (including interest) which the Overproducer shall be required to make. Any party may challenge any volumes or values or amounts specified in any of the statements furnished under Paragraph (f) above, in the same manner and subject to the same limitations as an invoice from an operator may be challenged under a AAPL Model Form Operating Agreement or the COPAS accounting procedure thereto, using the latest printed forms of same at the time of the challenge, without alteration; if no such printed forms exist at the time of challenge, then the most similar documents then in general use in the oil and gas industry shall be used.

(h) Each party taking production shall pay or cause to be paid all production and excise taxes, if any, on gas taken and sold for its account under this Balancing Provision. Moreover, such party shall pay or cause to be paid all royalties, overriding royalties and other payments on production it is obligated by law, by lease or by contract to pay. Each party hereto agrees to indemnify and hold harmless the other parties hereto against all claims, losses or liabilities arising out of its failure to fulfill such obligations.

9.  Miscellaneous.

(a) All exhibits or annexes hereto are incorporated herein and by this reference made a part hereof.

(b) There shall be no recordation of this Royalty Agreement or any memorandum thereof.

(c) Any notice, communication, request, reply or advise (collectively, "Notice") provided or permitted by this Royalty Agreement to be made or accepted by either party must be in writing. Notice may, unless otherwise provided herein, be given or served by depositing the same in the United States mail, postage paid, registered or certified, and addressed to the party to be notified, with return receipt requested; by delivering the same to such party, or an agent of such party; or by sending a post-paid telegram, when appropriate, addressed to the party to be notified. Notice deposited in the mail in the manner hereinabove described shall be effective upon such deposit. Notice given in any other manner shall be effective only if and when received by the party to be notified between the hours of 8:00 A.M. and 4:00 P.M. of any business day with delivery made after such hours to be deemed received the following business day. For the purposes of notice, the addresses of the parties shall, until changed as hereinafter provided, be as follows:

Owners:    Harrison Interests, Ltd.
        Texas Commerce Bank Building
        707 Travis, Suite 1900
        Houston, Texas 77002-3299
        Attention: Ed Knight

11



Producer:     For Notices as to all Marketing
              Elections:

              Meridian Oil Production Inc.
              2919 Allen Parkway
              Houston, Texas 77019
              Attention: _____
                         Director, Gas Supply and
                         Transportation and Exchange

              For All Other Notices:

              Meridian Oil Production Inc.
              2919 Allen Parkway
              Houston, Texas 77019
              Attention: Vice President, Land

The parties hereto shall have the right from time to time to change their respective addresses, and each shall have the right to specify as its address any other address within the United States of America by at least five (5) days written notice to the other party.

(d) This Royalty Agreement, together with the Deeds and Assignments, contain the entire agreement of the parties hereto, with regard to the Nonparticipating Royalties and the Overrides in the Subject Interests and there are no other agreements, oral or written, other than the Deeds and the Assignments. This Royalty Agreement can be amended only by written agreement signed by the parties hereto, and by reference made a part hereof.

(e) If any term, provision, or covenant relating to Owners' royalty or restrictions imposed hereby is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the reservation of royalty interests contained in the conveyances of even date herewith and the other terms, provisions and covenants of this Royalty Agreement shall not be affected thereby and the remainder of the terms, provisions, covenants and restrictions herein contained shall remain in full force and effect and in no way shall be affected, impaired, or invalidated.

(f) For a period of twelve months after the Effective Time, both parties agree to use good faith efforts to keep the material terms and provisions of this Royalty Agreement confidential and not to disclose same to a third party, except as may be required or compelled by Governmental Regulations or by order of a court of competent jurisdiction, provided that the parties shall not be required to keep confidential information that already is public knowledge or that any person by reasonable means could discover in the public domain. The terms of this paragraph 9(f) shall not constitute a condition precedent and the breach of the terms of this paragraph 9(f) shall not result in the right to alter, terminate or waive the terms of this Royalty Agreement.

IN WITNESS WHEREOF, this Royalty Agreement has been duly executed in multiple counterparts (each of which is to be deemed an original for all purposes) by the parties hereto on the date appearing opposite each party's signature.

12



Dated this 22nd day of May, 1990, but effective for all purposes as of 8:00 a.m., Central Daylight Savings Time, on May 22, 1990, which is the "Effective Time."

HARRISON INTERESTS, LTD.

By: _____
Dan J. Harrison III
General Partner

By: _____
Bruce F. Harrison
General Partner

_____
DAN J. HARRISON III

_____
BRUCE F. HARRISON

MERIDIAN OIL PRODUCTION INC.

By: _____
Name: Randolph B. Munster
Title: Vice President

1328S

13



ANNEX 1

to Royalty Agreement

Part J

## DESCRIPTION OF LAND

Beam Ranch:

The following land located in Edwards County, Texas:

| Abstract Number | Certificate Number | Survey Number | Original Grantee |
|---|---|---|---|
| 1219 | 833 | 15 | HE & WT Ry Co. |
| 2115 | 833 | 16 | HE & WT Ry Co. |
| 1220 | 834 | 17 | HE & WT Ry Co. |
| 3549 | 834 | 18 | HE & WT Ry Co. |
| 3550 | 622 | 204 | CCSD & RGNG Ry Co. |
| 777 | 623 | 205 | CCSD & RGNG Ry Co. |

LESS AND EXCEPT 13.53 acres out of Survey 15; 11.89 acres out of Survey 16 and 5.96 acres out of Survey 18 previously conveyed for highway purposes by deeds of record in Volume "N", Page 480, and Volume "N", Page 506, Deed Records of Edwards County, Texas.

Being the same land described in that certain deed from Edna Wheat Beam, as grantor, to D. J. Harrison, as grantee, dated December 31, 1945, of record in Volume 35, Page 437, Deed Records of Edwards County, Texas.

Bond Ranch:

The following land located in Edwards and Sutton Counties, Texas:

| Abst. No. | Surv. No. | Cert. No. | Block | Original Grantee | County |
|---|---|---|---|---|---|
| 19 | 1 | 1369 | C-11 | Perry Brown | Sutton & Edwards |
| 22 | 2 | 68 | C-11 | J. S. Clift | Sutton & Edwards |
| 528 | 3 | 908 | C-11 | Jno. V. Sloan | Sutton |
| 541 | 4 | 177 | C-11 | Josephine Timmons | Sutton |
| 507 | 5 | 166 | C-11 | Thomas Otis | Sutton |
| 818 | 1 | 568 | | CCSD & RGNG Ry Co. | Sutton & Edwards |
| 3026 | 2 | 568 | C-11 | CCSD & RGNG Ry Co. | Sutton & Edwards |
| 1 | 7 | 1312 | | W. A. Atkins | Sutton & Edwards |
| 490 | 6 | 562 | C-11 | R. Matthews | Sutton |
| 26 | 139 | 590 | | CCSD & RGNG Ry Co. | Sutton |
| 27 | 217 | 629 | | CCSD & RGNG Ry Co. | Sutton |
| 1128 | 8 | 534 | C-11 | Rhoda Pruitt | Sutton & Edwards |
| 1645 | 9 | 1567 | C-11 | Mrs. E. J. Tyson | Sutton |
| 1129 | 228 | 634 | | CCSD & RGNG Ry Co. | Sutton |
| 1130 | 138 | 589 | | CCSD & RGNG Ry Co. | Sutton |
| 1712 | 218 | 629 | | CCSD & RGNG Ry Co. | Sutton & Edwards |

Being the same land described in that certain deed from Mrs. Edith Bond et al, as grantors, to D. J. Harrison dated November 30, 1944, of record in Volume 41, Page 399 of the Deed Records of Sutton County, Texas, and in Volume 35, Page 150 of the Deed Records of Edwards County, Texas.

Appelt Ranch:

The following land, consisting of three blocks located in Edwards and Sutton Counties, Texas:

### FIRST BLOCK

| Abstract Number | Survey Number | Certificate Number | Original Grantee |
|---|---|---|---|
| 846 | 3 | 4/783 | GC & SF Ry Co. |
| 847 | 5 | 4/784 | GC & SF Ry Co. |
| 852 | 13 | 4/788 | GC & SF Ry Co. |
| 1596 | 111 | 576 | CCSD & RGNG Ry Co. |
| 779 | 211 | 626 | CCSD & RGNG Ry Co. |



| Abstract Number | Survey Number | Certificate Number | Original Grantee |
|---|---|---|---|
| 780 | 213 | 627 | CCSD & RGNG Ry Co. |
| 705 part | 5 | 2064 | Mrs. R. G. Alexander |
| 2930 | 210 | 625 | CCSD & RGNG Ry Co. |
| 3067 | 220 | 630 | CCSD & RGNG Ry Co. |
| 2601 | 212 | 626 | CCSD & RGNG Ry Co. |
| 1903 | 4 | 4/783 | GC & SF Ry Co. |
| 2039 | 12 | 4/787 | GC & SF Ry Co. |
| 2038 | 14 | 4/788 | GC & SF Ry Co. |
| 2040 | 110 | 575 | CCSD & RGNG Ry Co. |

All of said surveys being in Edwards County, Texas. The R. G. Alexander Survey No. 5 described above is being limited to the tract covered by deed from Frank Cloudt, Sr., to August Moos dated December 29, 1917, of record in Volume 19, Page 633, Deed Records of Edwards County, Texas.

## SECOND BLOCK

| Abstract Number | Survey Number | Certificate Number | Block Number | Original Grantee |
|---|---|---|---|---|
| 1316 | 92 | 566 | | CCSD & RGNG Ry Co. |
| 37 | 93 | 567 | | CCSD & RGNG Ry Co. |
| 1036 | 82 | 561 | | CCSD & RGNG Ry Co. |
| 62 | 103 | 572 | | CCSD & RGNG Ry Co. |
| 1317 | 104 | 572 | | CCSD & RGNG Ry Co. |
| 38 N1/2 | 83 | 562 | | CCSD & RGNG Ry Co. |
| 697 | 83 | 0/632 | 14 | TWNG Ry Co. |
| 1038 | 106 | 0/643 | 14 | TWNG Ry Co. |
| 709 | 107 | 0/644 | 14 | TWNG Ry Co. |
| 1037 | 12 | 180 | C | HE & WT Ry Co. |
| 386 | 13 | 181 | C | HE & WT Ry Co. |

All of such surveys being in Sutton County, Texas.

## THIRD BLOCK

| Abst. No. | | Surv. No. | Cert. No. | Original Grantee | County |
|---|---|---|---|---|---|
| 2050 | | 90 | 565 | CCSD & RGNG Ry Co. | Edwards |
| 36 & 825 | | 91 | 566 | CCSD & RGNG Ry Co. | Sutton & Edwards |
| 35 | | 105 | 573 | CCSD & RGNG Ry Co. | Sutton |
| 1714 & 2032 | | 106 | 573 | CCSD & RGNG Ry Co. | Sutton & Edwards |
| 1595 | | 107 | 574 | CCSD & RGNG Ry Co. | Edwards |
| 2506 | | 112 | 576 | CCSD & RGNG Ry Co. | Edwards |
| 33 & 828 | | 113 | 577 | CCSD & RGNG Ry Co. | Sutton & Edwards |
| 1180 | | 114 | 577 | CCSD & RGNG Ry Co. | Sutton |
| 34 | | 115 | 578 | CCSD & RGNG Ry Co. | Sutton |
| 1185 | | 126 | 583 | CCSD & RGNG Ry Co. | Sutton |
| 31 | | 127 | 584 | CCSD & RGNG Ry Co. | Sutton |
| 32 | | 207 | 624 | CCSD & RGNG Ry Co. | Sutton |
| 1715 & 2049 | | 208 | 624 | CCSD & RGNG Ry Co. | Sutton & Edwards |
| 778 | | 209 | 625 | CCSD & RGNG Ry Co. | Edwards |
| 2673 | W1/2 | 214 | 627 | CCSD & RGNG Ry Co. | Edwards |
| 2602 | E1/2 | 214 | 627 | CCSD & RGNG Ry Co. | Edwards |
| 28 & 781 | | 215 | 628 | CCSD & RGNG Ry Co. | Sutton & Edwards |
| 1179 | | 216 | 628 | CCSD & RGNG Ry Co. | Sutton |
| 782 | | 219 | 630 | CCSD & RGNG Ry Co. | Edwards |

Being the lands covered by that certain deed from Oscar Appelt et ux, as grantor, to D. J. Harrison, dated September 17, 1945 of record in Volume 42, page 360 of the Deed Records of Sutton County, Texas, and in Volume 35, Page 419, Deed Records of Edwards County, Texas, as resurveyed.

Said lands being subject to that certain Boundary Agreement by and between D. J. Harrison and W. L. Miers dated January 24, 1956, of record in Volume 40, Page 369, Deed Records of Edwards County, Texas.



## Part II

All of Surveys 81(A-63) and 116 (A-1647), originally granted to the CCSD & RGNG Ry.
Co., located in Sutton ounty, Texas.

jl/austin/ExA1

DESCRIPTION OF LEASES

1. Oil, gas and mineral lease dated November 5, 1971, recorded in Volume Z-17, page 256 of the Miscellaneous Records of Edwards County, Texas, from W.L. Miers and wife, Martha Miers, as lessor, to R.C. Roberts, as lessee, covering Survey 4 (A-1250), Cert. No. 4, Menard County School Land, Original Grantee, SAVE and EXCEPT 320 acres committed to the North American Royalties, Inc. No. 2 Miers "4" Well and 320 acres committed to the North American Royalties, Inc. No. 3 "4" Well, containing a total of 4,428.4 acres, more or less, subject to the following releases as to surface areas and subsurface depths:

   a. Partial release of oil, gas and mineral lease dated April 1, 1980, recorded in Volume Z-29, page 762 of the Miscellaneous Deed Records of Edwards County, Texas; and

   b. Partial release of oil, gas and mineral lease dated February 24, 1982, recorded in Volume Z-32, page 864 of the Miscellaneous Deed Records of Edwards County, Texas.

2. Oil, gas and mineral lease dated November 18, 1971, recorded in Volume 92, page 156 of the Deed Records of Sutton County, Texas, from Larmon L. Cox and wife, Pearl Cox, as lessor, to R.C. Roberts, as lessee, only insofar as such lease covers the Northeast Quarter (NE/4) of Section 70 (A-1039), CCSD & RGNG Railway Co. Survey, and the Southwest (SW/4) of Section 70 (A-1672), CCSD & RGNG Railway Co. Survey, both in Sutton County, Texas.

3. Oil, gas and mineral lease dated June 16, 1971, recorded in Volume 90, page 235 of the Deed Records of Sutton County, Texas, from L.L. McCandless, et al, as lessor, to North American Royalties, Inc., as lessee, only insofar as such lease covers the Southeast Quarter (SE/4) of Section 83 (A-38), Certificate 562, CCSD and RGNG Railway Co. Original Grantee, Sutton County, Texas.

4. Oil, gas and mineral lease dated June 20, 1972, recorded in Volume 96, page 494 of the Deed Records of Sutton County, Texas from Harold C. Stuart and wife, Joan Skelly Stuart, as lessor, to North American Royalties, Inc., as lessee, only insofar as such lease covers the Southeast Quarter (SE/4) of Section 83 (A-38), CCSD and RGNG Railway Co. Survey, Sutton County, Texas.

5. Oil, gas and mineral lease dated July 7, 1972, recorded in Volume 96, page 497 of the Deed Records of Sutton County, Texas, from Kirby Petroleum Co., as lessor, to North American Royalties, Inc., as lessee, only insofar as such lease covers the Southeast Quarter (SE/4) of Section 83 (A-38), CCSD and RGNG Railway Co. Survey, Sutton County, Texas; and

6. Oil, gas and mineral lease dated July 19, 1972, recorded in Volume 96, page 297 of the Deed Records of Sutton County, Texas from Historical Preservation, Inc., as lessor, to HNG Oil Company, as lessee, only insofar as such lease covers the Southeast Quarter (SE/4) Section 83 (A-38), CCSD and RGNG Railway Co. Survey, Sutton County, Texas.

   The interest in the five (5) leases listed above as item numbers 2 through 6, inclusive, is limited to depths from the surface down to 50 feet below the base of the Canyon Sand Formation.

7. Oil, gas and mineral lease dated June 1, 1972, recorded in Volume 96, page 62 of the Deed Records of Sutton County, Texas, from Harvey A. Heller and Harvey A. Heller, Jr., as lessor, to Dan J. Harrison, Jr., as lessee, covering Section 83, (A-697), Certificate No. 0/632, Block 14, TWNG Ry. Co. Survey, Sutton County, Texas.

S1357(2)

## ANNEX 3

### (to Royalty Agreement)

A.   All instruments described below are dated May 22, 1990.

B.   The grantee or assignee in each instrument is Meridian Oil Production Inc.

C.   References below to volume and page recording data are to the Deed Records of Sutton County, Texas, and to the Deed Records or Miscellaneous Deed Records of Edward County, Texas, as indicated below.

D.   "N/A" means not applicable.

| | | Recording Data | |
|---|---|---|---|
| | | Edwards | Sutton |
| **Instrument** | **Grantor/Assignor** | **County** | **County** |
| 1. Special Warranty Deed (Minerals) | Harrison Interests, Ltd., Dan J. Harrison III and Bruce F. Harrison | Vol: Z-47 Page: 445 Misc. Deed Records | Vol: 244 Page: 48 |
| 2. Special Warranty Deed (Surface) | Dan J. Harrison III | Vol: 81 Page: 797 Deed Records | Vol: 244 Page: 37 |
| 3. Special Warranty Deed (Surface) | Bruce F. Harrison | Vol: 81 Page: 785 Misc. Deed Records | Vol: 244 Page: 26 |
| 4. Special Warranty Deed (State Tract) | Dan J. Harrison III | Vol: N/A Page: N/A | Vol: 243 Page: 389 |
| 5. Special Warranty Deed (State Tract) | Bruce F. Harrison | Vol: N/A Page: N/A | Vol: 243 Page: 396 |
| 6. Assignment | Harrison Interests, Ltd., Dan J. Harrison III and Bruce F. Harrison | Vol: Z-47 Page: 430 Misc. Deed Records | Vol: 244 Page: 12 |
| 7. Quitclaim Deed | Harrison Interests, Ltd., Dan J. Harrison III and Bruce F. Harrison | Vol: N/A Page: N/A | Vol: 244 Page: 8 |

Signed for Identification Purposes:

MERIDIAN OIL PRODUCTION INC.

By: _____
Name:   Raymond P. Manat
Title:   SA. V. P.

HARRISON INTERESTS, LTD.

By: _____
Name:   Dan J. Harrison III
Title:   General Partner

H:\PSI\COLLIER\271111.1

DAN J. HARRISON III

BRUCE F. HARRISON

ROYALTY AGREEMENT

2.      Definitions.

"central facility" shall mean the final set of heaters, separators, meters and tanks that are operated as a unit and into which production from more than one oil or gas well on the Subject Interests is gathered for final treating and measurement prior to delivery to a gas transmission line owned or operated by a principal purchaser of gas in the Permian Basin..

"gross proceeds" shall mean the entire economic benefit and all consideration in whatever form received by or accruing to Producer or an affiliate of Producer, including but not limited to sales proceeds or proceeds or benefits of an exchange, prepayments for future production, reimbursements for severance taxes or for other taxes or costs, settlements or payments for the release or amendment of a sales contract or arrangement, and take-or-pay payments or settlements and the like, and any insurance proceeds from lost or destroyed oil and gas, provided that "gross proceeds" shall not include any fee or charge for services (transportation, compression, treating and the like) relating to gas produced from the Subject Interests after such gas leaves the Subject Interests. In the event Producer transports, or causes to be transported, gas production from the Subject Interests on a gas transmission line to a market or sale "gross proceeds" for such gas shall be determined after deducting any fees or charges incurred by Producer from the owner of the gas transmission line for such delivery or transportation to such market or sale; such fees or charges shall be for transportation of gas after it leaves facilities to which Marketing Costs, if any, relate and shall exclude fees or charges of Marketing Costs.

"Marketing Costs" shall mean:

        (i)      the reasonable, capital costs of property actually installed by Producer or an affiliate of Producer after the Effective Time, which property:

                (a)      is depreciable for purposes of the Internal Revenue Code of 1986, as amended; and

                (b)      is required to be installed downstream from a central facility in order to deliver gas produced from the Subject Interests to a gas transmission line or otherwise to a market; and

                (c)      is part of a facility to transport gas produced from the Subject Interests from a central facility to a gas transmission line or is part of a facility compressing or treating such gas as required for delivery to such a gas transmission line; and

        (ii)      charges made by a third party that is not an affiliate of Producer

directly attributable to property actually installed after the Effective Time, which property:

(a)     is installed downstream from a central facility in order to transport gas produced from the Subject Interests to a gas transmission line or otherwise to a market; and

(b)     is part of a facility required to transport gas produced from the Subject Interests from a central facility to a gas transmission line, or is part of a facility compressing or treating such gas as required for delivery to such a gas transmission line.

As to property actually installed by Producer or an affiliate of Producer, Marketing Costs shall be calculated as a monthly charge on a per MCF basis for the facilities to which the Marketing Costs relate, with such Marketing Costs amortized on a straight-line basis for the expected life of such facilities and based on the entire design capacity throughput of the facilities.  Marketing Costs charged to Producer by a third party shall be the rate actually charged to Producer.

4.     Gas.

(a)     As to gas produced or to be produced from the Subject Interests under a Short Term Sale, the royalties shall be Owners' royalty share of the gross proceeds for the first sale or disposition of the gas from the Subject Interests, provided that such royalties never shall be less than Owners' royalty share of the aggregate sum derived by multiplying the Spot Gas Price of such gas for the month or months covered by the Short Term Sale by the respective volumes of gas sold in such month or months under the Short Term Sale.

(b)     In the event Producer intends to make gas produced or to be produced from the Subject Interests subject to a Long Term Sale, ...

(c)     If the gas produced from any well situated on the Subject Interests shall contain in suspension condensate, gasoline or other natural gas liquid hydrocarbons that economically can be separated from the gas by the installation by Producer of traps, separators or other mechanical devices, then Producer shall install such devices on the surface of the Property, and Owners shall receive royalty on the condensate, gasoline or other natural gas liquids so recovered in accordance with the terms of paragraph 3 of this Royalty Agreement, together with royalty on the residue gas in accordance with the terms of paragraphs 4(a) and 4(b) of this Royalty Agreement.

(d)     If gas or casinghead gas or separated gas resulting from field separation produced from the Subject Interests is processed at any location by or for the account of Producer, or by or for the account of any affiliate of Producer, for the recovery and sale or other disposition for value of liquid hydrocarbons, helium, carbon dioxide, sulfur, or any other elements of the gas steam, then in lieu of royalties on gas provided in paragraphs 4(a)

and 4(b), the royalties shall be Owners' royalty share of the gross proceeds less Owners' royalty share allocable portion of the reasonable, direct costs (excluding amortization and depreciation on pipeline and plant investment and direct overhead associated therewith) of processing such gas in the plant for the recovery of such liquid hydrocarbons, helium, carbon dioxide, sulfur and other elements, and the royalties on the residue gas resulting from such processing operation attributable to gas produced from the Subject Interests shall be in an amount and determined as provided in paragraphs 4(a) and 4(b) above; provided, however, that in the event liquid hydrocarbons, helium, carbon dioxide, sulfur or any other elements of the gas stream are recovered and sold separate from the basic gas stream as contemplated in this paragraph, the total royalties paid to Owners on such production (after deduction of the above costs) never shall be less than would have been paid to Owners if the liquid hydrocarbons, helium, carbon dioxide, sulfur, or any other elements of the gas stream had remained in, and been sold as, part of the basic gas stream.

(e)     Owners shall receive their royalty share of the gross proceeds for gas used or utilized on or off the Subject Interests, such as gas used for fuel.

7.     General Terms.     The following general terms shall apply to the royalties covered by this Royalty Agreement.

(a)...

(b)     All royalties shall be determined and delivered or paid to Owners after deducting therefrom the following costs:

(i)     as to gas produced from the Subject Interests, Owners' royalty share of Producer's monthly Marketing Costs for such gas; however, for purposes of this paragraph 7(b), Producer's monthly Marketing Costs (whether actually incurred by Producer or an affiliate of Producer or charged to the Producer by a third party) shall not exceed ten (10) cents per MCF and shall be charged only as to gas production put through the facility for which the Marketing Costs are charged; and

(ii)     taxes applicable to Owners' royalty share of production.

Owners' royalties shall bear no other costs or expenses of any kind:

(g)     In the event that Owners' royalty share of gas is not committed to a Long Terms Sale in accordance with the provisions of this Agreement, then at any time and from time-to-time Owners may elect to take Owners' royalty share of gas production in kind and use or market same for their own account or to elect to deem royalty percentage of gas as not being produced, to the end that Owners' share of production is stored and covered under the Balancing Provisions provided below.

# APPENDIX C



Sonora Field

583

# APPENDIX D



DP6

rich gas

lean gas

compressor

separator

dehy/amine treater